UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                          :

      - v. -                          :    INDICTMENT

KEVIN CASSIDY,                          :    S1 08 Cr. 1101

         Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

*JUDGE GRIESA*

### COUNT ONE

(Conspiracy To Commit Wire Fraud And To Make False Bank Entries)

       The Grand Jury charges:

#### RELEVANT PERSONS AND ENTITIES

      1.    At all relevant times, Optionable Inc.
("Optionable") was a commodities brokerage firm with a focus on
natural gas and other energy derivatives.  Optionable's principal
place of business was in Westchester County, New York.  At
various times relevant to this Indictment, Optionable common
stock was publicly traded on the OTC Bulletin Board.

      2.    At all relevant times (other than from on or about
April 1, 2004 through in or about October 2005), KEVIN CASSIDY,
the defendant, was Optionable's chief executive officer.  From on
or about April 1, 2004, through in or about October 2005,
CASSIDY's job title was "consultant" to Optionable but his role
in running Optionable's day-to-day operations did not change.
From in or about September 2005 through at least in or about
April 2007, CASSIDY beneficially owned Optionable stock and

received annual compensation from Optionable.

      3.   At all relevant times, Bank of Montreal ("BMO") was a bank with its principal place of business in Toronto, Canada.  BMO operated a wholly-owned subsidiary called BMO Capital Markets Corporation.  A division within BMO Capital Markets Corporation called the Commodities Derivatives Group (hereinafter "the Commodities Group") was based in Manhattan and engaged in the business of trading instruments that derived their value from the market price of various underlying commodities, including natural gas.

      4.   At all relevant times, David Lee, a co-conspirator not named as a defendant herein, worked in the Commodities Group as BMO's lead natural gas options trader.  Lee's annual compensation included a base salary, a bonus based primarily on the profitability of the Commodities Group's trading activities, and long-term incentive compensation based primarily on Lee's individual productivity.  At all relevant times, most of Lee's compensation consisted of bonus payments.

<u>BMO'S VALUATION PROCEDURE</u>

      5.   At all relevant times, BMO required traders in the Commodities Group to assign the fair market value to each open financial position in the trader's portfolio, which was also known as a "book."  This process was known as "marking the book," and the value assigned to each position was a "mark."  BMO used these marks, among other things, to value the trading positions

of the Commodities Group, to determine the daily profit and/or loss for the Commodities Group, and to assess BMO's risk exposure related to the Commodities Group's trading positions.

6.    Through a process called "independent price verification," BMO sought to verify the accuracy of the marks that Commodities Group traders assigned to their positions by comparing those marks to independent market quotes for similar positions.

7.    In or about 2001, David Lee became BMO's lead natural gas options trader.  In connection with BMO's "independent price verification" process, Lee was required to mark the positions in BMO's natural gas options book (hereinafter "Lee's Positions") on a daily basis by assigning the fair market value to each position.  Because many of Lee's Positions were not widely traded on a public exchange, pricing information for comparable positions was not readily ascertainable to BMO based on public data.  Accordingly, as part of its independent price verification of Lee's marks, BMO compared Lee's marks to price quotes for similar positions that BMO obtained from third-party brokerage firms, which presented these quotes to BMO as independent and as accurately reflecting market prices.  At all relevant times, BMO's price verification personnel usually compared Lee's marks to price quotes obtained from only one brokerage firm: Optionable.

3

<u>THE SCHEME TO DEFRAUD</u>

<u>David Lee Mismarks His Book</u>

8.    In or about May 2003, David Lee began mismarking his natural gas options book by overstating the fair market value of some of Lee's Positions.  Between in or about 2003 and in or about 2006, Lee's inflated marks led BMO to believe that Lee's Positions were largely profitable, when in truth and in fact, many of them were not profitable.  As a result, BMO gave Lee greater trading authority, which enabled Lee to substantially increase the number of positions in BMO's natural gas options book.

9.    David Lee began mismarking Lee's Positions in 2003 in an effort to enhance his apparent job performance and thus his bonus compensation.  From 2003 to 2006, Lee's compensation increased from approximately $722,000 to approximately $5.35 million.

10.    By in or about 2006, however, changes in the natural gas market caused a sharp decline in the value of Lee's Positions.  In response, Lee stepped up his mismarking in order to maximize his profitable positions and minimize his losing positions.  Through this mismarking, Lee made his natural gas book appear materially more valuable than it was.

<u>Kevin Cassidy Helps Lee Conceal His Inflated Marks</u>

11.    At all relevant times, KEVIN CASSIDY, the

4

defendant, engaged in a scheme with David Lee to help Lee deceive BMO's price verification personnel into believing that Lee's inflated marks accurately reflected the fair market value of Lee's Positions.  To carry out this scheme, CASSIDY and Lee agreed that Lee would send price quotes for Lee's Positions that matched Lee's inflated marks to Optionable and that Optionable brokers then would return -- or regurgitate -- Lee's self-serving quotes to BMO's price verification personnel as if they were Optionable's accurate view of prevailing market prices for Lee's Positions and independent of Lee.  At all times, as CASSIDY knew, BMO was using this pricing information from Optionable to evaluate the accuracy of Lee's marks while under the impression that it was accurate and independent of Lee.

12.   KEVIN CASSIDY, the defendant, helped David Lee conceal the inflated value of Lee's Positions as a way of incentivizing Lee to use Optionable to execute Lee's commission-generating trades.  As CASSIDY knew, BMO paid lucrative commissions to the brokerage firms that Lee chose to execute his trades.

13.   KEVIN CASSIDY, the defendant, stood to profit, and in fact profited, from increases in the amount of trading business that Lee sent to Optionable.  CASSIDY's compensation at Optionable was based in part on Optionable's overall profitability.  In addition, once Optionable became a publicly

traded company in or about April 2005, Optionable included commissions from BMO in the revenue figures that it reported to the investing public, and CASSIDY knew that the share price of Optionable stock would likely increase with material increases in reported revenue.  CASSIDY wanted Optionable stock to trade at a higher share price for at least two reasons: first, as early as 2003, CASSIDY expressed an interest in selling part of Optionable to a third-party investor, and he knew that a higher value of the company would likely translate into a higher sale price; second, CASSIDY beneficially owned Optionable stock and contracts giving him the right to buy Optionable stock in the future.

14.   Accordingly, in order to attract and retain lucrative commission-generating business from David Lee and to insure that Lee remained in a position of good standing at BMO from which he would continue to handle trades that needed to be executed, KEVIN CASSIDY, the defendant, and others known and unknown, helped Lee mislead BMO's price verification personnel about the accuracy of the marks that Lee assigned to Lee's Positions.

<u>The Use Of "Round Trips"</u>

15.   As part of this scheme, beginning in or about 2003, KEVIN CASSIDY, the defendant, and David Lee agreed that Lee would send pricing information that was consistent with his marks to Optionable brokers twice each month and that Optionable

brokers then would return that information -- virtually unchanged
-- on a "round-trip" or "u-turn" to BMO's price verification
personnel, without disclosing to BMO that this information
originated with Lee himself.  Consistent with this agreement
between CASSIDY and Lee, Optionable personnel routinely received
pricing information from Lee and regurgitated it in reports sent
by interstate email to BMO's independent price verification and
market risk personnel without disclosing that Lee was its source.

16.  To carry out this scheme, at various times
relevant to this Indictment, at the end of each month, KEVIN
CASSIDY, the defendant, also received pricing information for
Lee's Positions from David Lee by telephone calls and instant
messages and then returned this information -- virtually
unchanged -- to Lee by instant messages, knowing full well that
Lee would submit it to BMO's market risk personnel.  CASSIDY
prepared the instant messages that he sent to Lee in a way that
made them appear to reflect actual offers to trade from willing,
able, and independent natural gas options traders when, in truth
and fact, as CASSIDY knew full well, these instant messages
merely regurgitated Lee's own pricing information.

<u>The Use Of "RealMarks"</u>

17.  In or about September 2006, BMO's independent
price verification and market risk personnel discussed whether to
begin verifying David Lee's marks by comparing them to pricing

7

information from a so-called multi-contributor pricing service
(the "Multi-Contributor Service") instead of by comparing them to
pricing information from Optionable.  The Multi-Contributor
Service reported pricing information that it collected and
aggregated from multiple independent natural gas traders.

18.  Concerned that BMO's use of the Multi-Contributor
Service pricing information would lead BMO to discover that he
had been overvaluing his book, David Lee consulted with KEVIN
CASSIDY, the defendant.  As part of his continuing effort to help
deceive BMO about the inflated value of Lee's book, CASSIDY came
up with the idea of providing BMO's independent price
verification and market risk personnel with false, inflated
pricing information for Lee's Positions under the guise of a new
pricing service introduced by Optionable.  This new service was
called "RealMarks" and, less frequently, "OPEX Analytics."

19.  RealMarks appeared as a grid with specific trading
positions in one column and corresponding market quotes in other
columns.  Optionable publicly described RealMarks as providing
"up-to-date, reliable information as to the real-time market
valuations of options" and as "an invaluable tool for clients in
monitoring their natural gas and energy derivative portfolios."

20.  From in or about September 2006 through and
including in or about March 2007, at the end of the month, David
Lee filled out RealMarks grids with false pricing information for

some of Lee's Positions that concealed losses associated with those positions.  Using his personal email account from his home in New Jersey, Lee sent these completed grids to KEVIN CASSIDY, the defendant, in Westchester County, New York.  CASSIDY instructed an Optionable employee to return these grids to BMO with Lee's own pricing information without disclosing that, as CASSIDY knew, the pricing information reflected on the RealMarks grids originated with Lee himself.

21.   From in or about September 2006 through in or about March 2007, after receiving the RealMarks grids from David Lee containing false pricing information for Lee's Positions, KEVIN CASSIDY, the defendant, instructed Optionable personnel to disseminate this false pricing information by instant messages to various traders in the natural gas sector.  CASSIDY instructed these Optionable personnel to return copies of these instant messages to him.  CASSIDY submitted these instant messages to BMO as "backup" to support the purported accuracy and independence of the false pricing information that Optionable provided to BMO in the RealMarks grids without disclosing that, as CASSIDY knew, the pricing information reflected on the RealMarks grids originated with Lee himself.

### Optionable's Business From BMO Increases

22.   During the period when KEVIN CASSIDY, the defendant, was helping David Lee deceive BMO about the true value

of Lee's Positions, Optionable received an increasing amount of commission-generating trading business from BMO and these commissions constituted a growing and material percentage of Optionable's revenues.  In its annual filing with the United States Securities and Exchange Commission ("SEC") for 2005, Optionable reported that commissions from BMO accounted for 18 percent of its annual revenues.  In its annual filing with the SEC for 2006, Optionable reported that commissions from BMO accounted for 24 percent of its annual revenues.  In the first quarter of 2007, according to information that Optionable provided to its auditor as part of a quarterly review, commissions from BMO accounted for approximately 44 percent of Optionable's annual brokerage revenues -- or approximately $2.3 million, which was more than Optionable generated from any other revenue source.

23.   In practical terms, the percent of Optionable's revenue attributable to executing trades for BMO was significantly higher than the percentages that Optionable reported in its filings with the SEC.  When Optionable executed trades on behalf of BMO, in addition to receiving commissions from BMO, Optionable also received commissions from the counterparties to those trades.

<u>THE SCHEME UNRAVELS</u>

24.   In or about October 2006, BMO's independent price

10

verification and market risk personnel started comparing the pricing information contained in Optionable's RealMarks grids with information from the Multi-Contributor Service.  The information from the Multi-Contributor Service indicated that David Lee's natural gas book was overvalued by tens of millions of dollars.

25.  In or about February 2007, BMO hired an outside consultant to assess BMO's independent price verification process.  In the meantime, the difference in the value of Lee's Positions based on pricing data from the Multi-Contributor Service and from Optionable's RealMarks service continued to grow by millions of dollars.  Around the same time, BMO began to liquidate some of Lee's Trading Positions at a loss out of a concern that David Lee's book had grown too large.

26.  In response to these developments, KEVIN CASSIDY, the defendant, and David Lee tried reassuring BMO about the accuracy and benefits of RealMarks.  Among other things, during a meeting with BMO's independent price verification and market risk personnel, CASSIDY falsely reiterated that RealMarks contained reliable and accurate pricing information.  Using the email account of another Optionable employee, CASSIDY also sent email to BMO's independent price verification and market risk personnel falsely stating that the pricing information provided by Optionable concerning Lee's Positions was accurate, reliable, and

independent of Lee.  In addition, in discussions with BMO's outside consultants about RealMarks, CASSIDY failed to disclose that, as he knew full well, the pricing data in the RealMarks reports that Optionable submitted to BMO merely regurgitated Lee's own pricing information under the guise of being independent of Lee.

27.  On or about April 27, 2007, before the stock market opened in the United States, BMO publicly announced for the first time that it had sustained millions of dollars in commodities trading losses, which included losses attributable to Lee's Trading Positions.  On April 27, 2007, Optionable stock opened at $7.20 per share and closed at $5.56 per share.  On or about May 8, 2007, BMO publicly announced that it had suspended its business relationship with Optionable.  On or about May 9, 2007, Optionable publicly reported that its loss of BMO's business would have an adverse impact on Optionable's "business, including its future results of operations and financial condition."  On May 10, 2007, Optionable stock closed at $0.85 per share.

28.  On or about May 16, 2007, David Lee's employment at BMO ended.

29.  On or about May 17, 2007, BMO publicly announced that it had experienced commodities trading losses of approximately C$680 million.  In its Annual Report for 2007, BMO

reported that it had experienced commodities trading losses of approximately C$853 million, which included losses resulting from BMO's remarking and liquidating Lee's Positions.

30.   In an SEC filing for the third quarter of 2007, Optionable reported approximately $64,000 in commission revenue. In an SEC filing for the first quarter of 2008, Optionable reported no revenue.

<u>Statutory Allegations</u>

31.   From in or about May 2003 through and including in or about March 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; and (2) making false bank entries, in violation of Title 18, United States Code, Section 1005.

32.   It was a part and an object of the conspiracy that KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent

13

pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writing, signs, pictures, signals, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

33.   It was a further part and object of the conspiracy that KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown, unlawfully, willfully, and knowingly, would and did make a false entry in any book, report, or statement of a branch of a foreign bank (Bank of Montreal) with intent to injure or defraud such branch or to deceive any officer of such branch or any agent or examiner appointed to examine the affairs of such bank, in violation of Title 18, United States Code, Section 1005.

## Overt Acts

34.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about May 30, 2003, at approximately 11:04 a.m., David Lee sent an email to an Optionable employee that provided pricing information relating to Lee's Positions.

b.   On or about May 30, 2003, at approximately 4:28

14

p.m., KEVIN CASSIDY, the defendant, directed an Optionable employee to send an interstate email to BMO's independent price verification and market risk personnel containing the exact same pricing information that Lee had sent to the Optionable employee earlier that same day but did not inform BMO that the pricing information came directly from Lee.

   c.   On or about December 29, 2004, at approximately 2:41 p.m., Lee sent an instant message to CASSIDY that contained pricing information relating to Lee's Positions.

   d.   On or about December 29, 2004, at approximately 3:32 p.m., Lee sent an instant message to an Optionable employee that contained false pricing information relating to Lee's Positions.

   e.   On or about December 29, 2004, at approximately 3:39 p.m., CASSIDY directed an Optionable employee to send an interstate email to BMO's price verification and market risk personnel containing the exact same pricing information that Optionable had received from Lee earlier that same day, without informing BMO that the pricing information came directly from Lee.

   f.   On or about June 29, 2006, at approximately 11:03 a.m., CASSIDY spoke with Lee by telephone about sending pricing information to BMO's price verification and market risk personnel.

g.    On or about October 31, 2006, CASSIDY had a telephone conversation with Lee about wanting to speak with Lee on an unrecorded phone line in order to avoid being recorded as they discussed RealMarks reports that contained false information.

h.    On or about January 30, 2007, Lee sent a blank RealMarks grid from his BMO email account while in Manhattan to his personal email account that he accessed in New Jersey.

i.    On or about February 28, 2007, CASSIDY had a telephone conversation with Lee about wanting to speak on an unrecorded phone line in order to avoid being recorded as they discussed RealMarks reports that contained false information.

j.    On or about March 30, 2007, CASSIDY had a telephone conversation with Lee about wanting to speak on an unrecorded phone line in order to avoid being recorded as they discussed RealMarks reports that contained false information.

k.    On or about March 30, 2007, at approximately 5:17 p.m., CASSIDY had a telephone conversation with Lee about having mistakenly sent pricing information to BMO's price verification and market risk personnel without having first obtained Lee's approval of the information contained in the report.

(Title 18, United States Code, Section 371.)

**COUNT TWO**

(Wire Fraud)

The Grand Jury further charges:

35.   The allegations set forth in paragraphs 1 through 30 and 34 are repeated and realleged as if set forth fully herein.

36.   On or about January 30, 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, unlawfully, wilfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to deceive the Bank of Montreal with David Lee's pricing information disguised in the RealMarks grid, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, for the purpose of executing such scheme and artifice, to wit, an email containing a blank RealMarks grid from New York, New York to New Jersey.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT THREE**

(False Statements To A Bank)

The Grand Jury further charges:

37.   The allegations set forth in paragraphs 1 through 30 and 34 are repeated and realleged as if set forth fully

herein.

38.   From in or about September 2006 through and including in or about March 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, unlawfully, willfully, and knowingly, would and did aid and abet the making of a false entry in any book, report, or statement of a branch of a foreign bank (Bank of Montreal) with intent to injure or defraud such branch or to deceive any officer of such branch or any agent or examiner appointed to examine the affairs of such bank, to wit, CASSIDY informed BMO personnel that the pricing information provided by Optionable in RealMarks grids was accurate and independent when, in truth and in fact, as CASSIDY knew, the pricing information originated with David Lee and was materially inaccurate.

(Title 18, United States Code, Sections 1005 and 2.)

## COUNT FOUR

(Securities Fraud -- Optionable)

The Grand Jury further charges:

39.   The allegations set forth in paragraphs 1 through 30 and 34 are repeated and realleged as if set forth fully herein.

## Optionable Makes False And Misleading SEC Filings

40.   At various times in 2005 and 2006, Optionable made public regulatory filings with the United States Securities and

18

Exchange Commission ("SEC").   KEVIN CASSIDY, the defendant, signed these filings.   These filings reported revenue figures that included material commissions that BMO paid to Optionable for executing David Lee's trades without disclosing that, as CASSIDY knew full well: (a) CASSIDY and other Optionable personnel were helping Lee deceive BMO about the value of Lee's Positions; and (b) the commissions that Optionable received from BMO included trades that Lee selected Optionable to execute on his behalf in furtherance of the fraudulent scheme.

41.   For example, in its filing for 2006 filed with the SEC on Form 10-KSB which KEVIN CASSIDY, the defendant, signed, Optionable reported publicly that in 2006 it generated approximately $16 million in brokerage fees and that revenue from BMO "accounted for 24% of [its] revenues during 2006."   This report did not disclose that (a) CASSIDY and other Optionable personnel were helping Lee deceive BMO about the value of Lee's Positions; and (b) the commissions that Optionable received from BMO included trades that Lee selected Optionable to execute on his behalf in furtherance of the fraudulent scheme.

42.   Optionable's stock price increased from a closing price of $1.00 per share on or about September 27, 2005 (when Optionable stock began trading publicly) to an opening price of $7.20 per share on or about April 27, 2007 (before BMO first announced commodities trading losses that were associated with

Lee's Positions).

Statutory Allegation

43.   From in or about May 2003 through and including in or about April 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of Optionable securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon a person.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

**COUNT FIVE**

(Securities Fraud -- NYMEX)

The Grand Jury further charges:

44.   The allegations set forth in paragraphs 1 through

30 and 34 are repeated and realleged as if set forth fully herein.

45.   At all relevant times, NYMEX Holdings, Inc. was the parent company of the New York Mercantile Exchange ("NYMEX"). NYMEX is a commodities futures exchange based in Manhattan.

46.   On or about January 22, 2007, KEVIN CASSIDY, the defendant, and others, entered into a binding term sheet with NYMEX in which NYMEX agreed in principal to buy an amount of common stock of Optionable that would give NYMEX a 19 percent ownership interest in Optionable.

47.   During the course of this sale to NYMEX, with the knowledge and consent of KEVIN CASSIDY, the defendant, Optionable provided NYMEX with access to its revenue figures.  Consistent with the revenue figures in Optionable's publicly filed regulatory filings, these revenue figures included material commissions from BMO without disclosing that (a) CASSIDY and other Optionable personnel were helping Lee deceive BMO about the value of Lee's Positions; and (b) the commissions that Optionable received from BMO included trades that Lee selected Optionable to execute on his behalf in furtherance of the fraudulent scheme.

48.   On or about January 15, 2007, NYMEX asked Optionable for "[a]ny other documents or information which, in your judgment, are significant with respect to any portion of the business of [Optionable] or which should be considered and

reviewed in making disclosures regarding the business and financial condition of [Optionable] to prospective investors." On behalf of Optionable, KEVIN CASSIDY, the defendant, did not disclose to NYMEX that (a) CASSIDY and other Optionable personnel were helping Lee deceive BMO about the value of Lee's Positions; and (b) the commissions that Optionable received from BMO included trades that Lee selected Optionable to execute on his behalf in furtherance of the fraudulent scheme.

49.   In or about April 2007, KEVIN CASSIDY, the defendant, certified in a purchase agreement with NYMEX that Optionable's regulatory filings were materially accurate even though, as CASSIDY knew full well, those filings omitted that (a) CASSIDY and other Optionable personnel were helping Lee deceive BMO about the value of Lee's Positions; and (b) the commissions that Optionable received from BMO included trades that Lee selected Optionable to execute on his behalf in furtherance of the fraudulent scheme.

50.   On or about April 10, 2007, NYMEX paid KEVIN CASSIDY, the defendant, approximately $5.1 million for his beneficially owned Optionable stock.   CASSIDY remained Optionable's chief executive officer.

<u>Statutory Allegation</u>

51.   From in or about 2005 through and including in or about April 2007, in the Southern District of New York and

22

elsewhere, KEVIN CASSIDY, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of Optionable securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon a person.

    (Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
        Title 18, United States Code, Section 2).

## COUNT SIX

(Wire Fraud -- Intercontinental Exchange)

The Grand Jury further charges:

    52.  The allegations set forth in paragraphs 1 and 2 are repeated and realleged as if set forth fully herein.

    53.  At all relevant times, the Intercontinental Exchange ("ICE") operated global commodity and financial products marketplaces, including an electronic energy markets exchange.

54.  At all relevant times, KEVIN CASSIDY, the defendant, previously had been convicted of various federal felonies, including wire fraud, tax fraud, trafficking in a counterfeit device, and improper reporting of a currency transaction.

55.  In or about November 2003, Optionable and ICE entered negotiations concerning ICE's potential purchase of an ownership interest in Optionable.  CASSIDY was involved in those negotiations on behalf of Optionable.  In connection with those negotiations, CASSIDY sent an interstate email to ICE containing a false name and social security number for himself in an effort to conceal his prior criminal record.

56.  After discovering that KEVIN CASSIDY, the defendant, had provided it with a false name and social security number for himself, and learning that he had a criminal record, ICE terminated negotiations with Optionable.

<u>Statutory Allegation</u>

57.  In or about November 2003, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, unlawfully, wilfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to deceive ICE in connection with ICE's contemplated purchase of an ownership

interest in Optionable, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, for the purpose of executing such scheme and artifice, to wit, an interstate email containing a false name and social security number for himself.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

58.  As the result of committing one or more of the offenses alleged in Counts One through Six herein, defendant KEVIN CASSIDY shall forfeit to the United States all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

### Substitute Asset Provision

59.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

(Title 18, United States Code, Section 981, Title 28, United
States Code, Section 2461.)

_____
Foreperson

_____
MICHAEL J. GARCIA
United States Attorney

26

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

KEVIN CASSIDY,

Defendant.

## INDICTMENT

S1 08 Cr. 1101

(18 U.S.C. §§ 371, 1343, 1005, 2; 15
U.S.C. §§ 78j(b) and 78ff)

Michael J. Garcia
United States Attorney.

A TRUE BILL

Foreperson.