USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/2/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                                :

UNITED STATES OF AMERICA

                          :      **INDICTMENT**

    - v. -

                          :      S3 08 Cr. 1101

KEVIN CASSIDY,

                          :

        Defendant.

                          :

------------------------------------x

## COUNT ONE

(Conspiracy To Commit Wire Fraud)

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

1.    At all relevant times, Optionable Inc. ("Optionable") was a commodities brokerage firm with a focus on natural gas and other energy derivatives.  At all relevant times, Optionable's principal place of business was in Westchester County, New York.  At various times relevant to this Indictment, Optionable common stock was publicly traded on the OTC Bulletin Board.

2.    At all relevant times (other than from in or about April 2004 through in or about October 2005), KEVIN CASSIDY, the defendant, was Optionable's chief executive officer.  From in or about April 2004, through in or about October 2005, CASSIDY's job title was "consultant" to Optionable but his role in running

Optionable's day-to-day operations did not change.  From in or about September 2005 through at least in or about April 2007, CASSIDY beneficially owned Optionable stock and received annual compensation from Optionable.

3.   At all relevant times, Bank of Montreal ("BMO") was a bank with its principal place of business in Toronto, Canada. BMO operated a wholly-owned subsidiary called BMO Capital Markets Corporation.  A division within BMO Capital Markets Corporation called the Commodities Derivatives Group (hereinafter "the Commodities Group") was based in Manhattan and engaged in the business of trading instruments that derived their value from the market price of various underlying commodities, including natural gas.

4.   At all relevant times, David Lee, a co-conspirator not named as a defendant herein, worked in the Commodities Group as BMO's lead natural gas options trader.  Lee's annual compensation included a base salary, a bonus based primarily on the profitability of the Commodities Group's trading activities, and long-term incentive compensation based primarily on Lee's individual productivity.  At all relevant times, most of Lee's compensation consisted of bonus payments.

<u>BMO'S INDEPENDENT PRICE VERIFICATION SYSTEM</u>

5.   At all relevant times, BMO required traders in the
Commodities Group to assign the fair market value to each open
financial position in the trader's portfolio, which was also
known as a "book."  This process was known as "marking the
book," and the value assigned to each position was a "mark."
BMO used these marks, among other things, to value the trading
positions of the Commodities Group, to determine the profit
and/or loss for the Commodities Group, and to assess BMO's risk
exposure from the Commodities Group's trading positions.

6.   Through a process called "independent price
verification," BMO sought to verify the accuracy of the marks
that Commodities Group traders assigned to their positions by
comparing the traders' marks to independent market quotes for
similar positions.

7.   In or about 2001, Lee became BMO's lead natural gas
options trader.  In connection with BMO's independent price
verification process, Lee was required to mark the positions in
BMO's natural gas options book (hereinafter "Lee's Positions")
on a regular basis by assigning the fair market value to each
position.

8.   Because many of Lee's Positions were not widely traded on a public exchange, BMO could not readily ascertain pricing information for comparable positions based on public data. Accordingly, as part of its independent price verification of Lee's marks, BMO obtained price quotes from third-party brokerage firms for positions similar to Lee's Positions ("Verification Quotes") and compared Lee's marks to those Verification Quotes.

9.   At all relevant times, BMO's price verification personnel obtained Verification Quotes for Lee's Positions from Optionable.

<u>LEE MISMARKS HIS BOOK</u>

10.   In or about May 2003, Lee began mismarking some of Lee's Positions by overstating their fair market value.  Lee continued mismarking some of Lee's Positions through at least in or about 2006, so as to lead BMO to believe that Lee's Positions were more profitable than they were; in fact, many of Lee's Positions were not profitable.  As a result of having been misled, BMO gave Lee greater trading authority, which enabled Lee to increase substantially the number of positions in BMO's natural gas options book.

-4-

11.   Lee mismarked Lee's Positions in an effort to enhance his apparent job performance and his bonus compensation.   Lee's compensation increased from approximately $722,000 in or about 2003 to approximately $5.35 million in or about 2006.

12.   In or about 2006, changes in the natural gas market caused a decline in the value of Lee's Positions.   Lee continued his mismarking during this time and made his natural gas book appear materially more valuable than it was.

<u>THE SCHEME TO DEFRAUD</u>

<u>Cassidy Helps Lee Subvert BMO's</u>
<u>Independent Price Verification System</u>

13.   During the period in which Lee was mismarking the value of Lee's Positions, KEVIN CASSIDY, the defendant, engaged in a scheme with Lee to subvert BMO's independent price verification system and, thereby, deny BMO its right to exercise supervision and control over its own assets.   To carry out this scheme, CASSIDY and Lee agreed that Lee would supply price quotes for Lee's Positions to Optionable and that Optionable brokers then would return – or regurgitate – Lee's self-serving quotes to BMO's price verification personnel as Verification Quotes for Lee's Positions, knowing that the quotes had actually originated with Lee, himself.   At all times, as CASSIDY knew, BMO was using this pricing information from Optionable to

evaluate the accuracy of Lee's marks while under the impression that the Verification Quotes were independent of Lee.

14. KEVIN CASSIDY, the defendant, helped Lee evade BMO's legitimate oversight in the foregoing manner because, among other things, Lee had the power to select Optionable to execute Lee's commission-generating trades. As CASSIDY knew, BMO paid lucrative commissions to the brokerage firms that Lee chose to execute his trades.

15. KEVIN CASSIDY, the defendant, stood to profit, and in fact profited, from trading business that Lee sent to Optionable. Among other things, CASSIDY's compensation at Optionable was based on Optionable's overall profitability. In addition, Optionable's revenue and profitability impacted the value of CASSIDY'S ownership interest in Optionable.

### The Use Of "Round Trips"

16. As part of this scheme, beginning in or about 2003, KEVIN CASSIDY, the defendant, and Lee agreed that Lee would send pricing information to Optionable brokers twice each month and that Optionable brokers then would return that information – virtually unchanged – on a "round-trip" or "u-turn" to BMO's price verification personnel, without disclosing to BMO that this information originated with Lee himself. Consistent with

-6-

this agreement between CASSIDY and Lee, Optionable personnel routinely received pricing information from Lee and regurgitated it in reports sent by interstate and international email to BMO's independent price verification and market risk personnel without disclosing that Lee was the information's source.

17.   Similarly, at various times relevant to this Indictment, Lee provided pricing information for Lee's Positions to KEVIN CASSIDY, the defendant, by telephone and instant message, and CASSIDY then returned the information – virtually unchanged – to Lee by instant message, knowing that Lee would submit the information to BMO's market risk personnel.

### The Use Of "RealMarks"

18.   In or about September 2006, BMO's independent price verification and market risk personnel discussed whether to begin verifying Lee's marks by comparing them to pricing information from a so-called multi-contributor pricing service (the "Multi-Contributor Service"), instead of by comparing them to Verification Quotes from Optionable.  The Multi-Contributor Service reported pricing information that it collected and aggregated from multiple independent natural gas traders.

19.   In order to forestall BMO's reliance on a Multi-Contributor Service to verify Lee's marks, KEVIN CASSIDY, the

-7-

defendant – after consulting with Lee – induced BMO to subscribe instead to a new pricing service introduced by Optionable, called (among other things) "RealMarks." RealMarks appeared as a grid with specific types of options in one column and corresponding market quotes in other columns. Optionable publicly described RealMarks as providing "up-to-date, reliable information as to the real-time market valuations of options" and as "an invaluable tool for clients in monitoring their natural gas and energy derivative portfolios."

20. From in or about September 2006 through and including in or about March 2007, at the end of the month, Lee filled out RealMarks grids with pricing information for some of Lee's Positions. Using his personal email account from his home in New Jersey, Lee sent these completed grids to KEVIN CASSIDY, the defendant, in Westchester County, New York. CASSIDY instructed an Optionable employee to return these grids to BMO with Lee's own pricing information without disclosing that, as CASSIDY knew, the pricing information reflected on the RealMarks grids originated with Lee himself.

21. From in or about September 2006 through in or about March 2007, after receiving the RealMarks grids from Lee containing pricing information for Lee's Positions that

-8-

originated from Lee himself, KEVIN CASSIDY, the defendant, instructed Optionable personnel to disseminate this pricing information by instant message to various traders in the natural gas sector.  CASSIDY instructed these Optionable personnel to return copies of these instant messages to him.  CASSIDY submitted these instant messages to BMO as "backup" to support the purported accuracy and independence of the pricing information that Optionable provided to BMO in the RealMarks grids without disclosing that, as CASSIDY knew, the pricing information reflected on the RealMarks grids originated with Lee himself.

### Optionable's Business From BMO Increases

22.  During the period when KEVIN CASSIDY, the defendant, was helping Lee subvert BMO's independent price verification system and, thereby, deny BMO its right to exercise supervision and control over its own assets, Optionable received an increasing amount of commission-generating trading business from BMO, and these commissions constituted a growing percentage of Optionable's revenues.  In its annual filing with the United States Securities and Exchange Commission ("SEC") for 2005, Optionable reported that commissions from BMO accounted for 18 percent of its annual revenues.  In its annual filing with the

-9-

SEC for 2006, Optionable reported that commissions from BMO accounted for 24 percent of its annual revenues.  In the first quarter of 2007, according to information that Optionable provided to its auditor as part of a quarterly review, commissions from BMO accounted for approximately 44 percent of Optionable's annual brokerage revenues – or approximately $2.3 million, which was more than Optionable generated from any other revenue source.

23.  In practical terms, the percentage of Optionable's revenue attributable to executing trades for BMO was significantly higher than the percentages that Optionable reported in its filings with the SEC.  When Optionable executed trades on behalf of BMO, in addition to receiving commissions from BMO, Optionable also received commissions from the counterparties to those trades.

<u>The Scheme Unravels</u>

24.  In or about October 2006, BMO's independent price verification and market risk personnel started comparing the pricing information contained in Optionable's RealMarks grids with information from the Multi-Contributor Service.  The information from the Multi-Contributor Service indicated that Lee's Positions were overvalued by tens of millions of dollars.

-10-

25.   In or about February 2007, BMO hired an outside consultant to assess BMO's independent price verification process.   In the meantime, the difference in the value of Lee's Positions based on pricing data from the Multi-Contributor Service and from Optionable's RealMarks service continued to grow by millions of dollars.   Around the same time, BMO began to liquidate some of Lee's Positions at a loss.

26.   On or about April 27, 2007, before the stock market opened in the United States, BMO publicly announced for the first time that it had sustained millions of dollars in commodities trading losses, which included losses attributable to remarking and liquidating Lee's Positions.   On April 27, 2007, Optionable stock opened at $7.20 per share and closed at $5.56 per share.   On or about May 8, 2007, BMO publicly announced that it had suspended its business relationship with Optionable.   On or about May 9, 2007, Optionable publicly reported that its loss of BMO's business would have an adverse impact on Optionable's "business, including its future results of operations and financial condition."   On May 10, 2007, Optionable stock closed at $0.85 per share.

27.   In or about mid-May 2007, Lee's employment at BMO ended.

-11-

28.  On or about May 17, 2007, BMO publicly announced that it had experienced commodities trading losses of approximately C$680 million.  In its Annual Report for 2007, BMO reported that it had experienced commodities trading losses of approximately C$853 million, which included losses resulting from remarking and liquidating Lee's Positions.

29.  In an SEC filing for the third quarter of 2007, Optionable reported approximately $64,000 in commission revenue. In an SEC filing for the first quarter of 2008, Optionable reported no revenue.

### Statutory Allegations

30.  From in or about May 2003 through and including in or about March 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

31.  It was a part and an object of the conspiracy that KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown,

unlawfully, willfully, and knowingly, having devised and

intending to devise a scheme and artifice to defraud, and for

obtaining money and property by means of false and fraudulent

pretenses, representations, and promises, would and did transmit

and cause to be transmitted by means of wire, radio, and

television communication in interstate and foreign commerce,

writings, signs, pictures, signals, and sounds for the purpose

of executing such scheme and artifice, in violation of Title 18,

United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

(Wire Fraud)

The Grand Jury further charges:

32.  The allegations set forth in paragraphs 1 through 29

are repeated and realleged as if set forth fully herein.

33.  From in or about May 2003 through and including in or

about March 2007, in the Southern District of New York and

elsewhere, KEVIN CASSIDY, the defendant, unlawfully, willfully,

and knowingly, having devised and intending to devise a scheme

and artifice to defraud and for obtaining money and property by

means of false and fraudulent pretenses, representations, and

promises, to wit, a scheme to subvert BMO's independent price

verification system and, thereby, deny BMO its right to exercise supervision and control over its own assets, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, for the purpose of executing such scheme and artifice, to wit, interstate and international emails from Optionable to BMO's independent price verification and market risk personnel containing pricing information relating to Lee's Positions.

(Title 18, United States Code, Sections 1343 and 2.)


## COUNT THREE

(Securities Fraud - Optionable)

The Grand Jury further charges:

34.   The allegations set forth in paragraphs 1 through 29 are repeated and realleged as if set forth fully herein.

### Optionable Submits False And Misleading SEC Filings

35.   At various times in 2005, 2006, and 2007, KEVIN CASSIDY, the defendant, caused Optionable to make public regulatory filings with the SEC.  Specifically, Optionable made such filings on or about at least: November 7, 2005; March 15, 2006; May 5, 2006; July 25, 2006; October 25, 2006; and March

-14-

23, 2007 (the "SEC Filings").  CASSIDY personally signed each of the SEC Filings, in his capacity as Optionable's chief executive officer.

36.   None of the SEC Filings disclosed that KEVIN CASSIDY, the defendant, had been engaged with Lee in a scheme to defraud BMO.  By causing Optionable to make these public filings, while concealing the scheme to defraud BMO, CASSIDY employed devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon a person.

37.   In particular, in each of the SEC Filings, Optionable represented that a substantial portion of its revenue was attributable to a particular customer, which it expressly identified (or is identifiable) as BMO.  However, Optionable failed to disclose that, as CASSIDY knew, CASSIDY was engaged with Lee in a scheme to defraud BMO, and if and when BMO discovered the existence of that scheme, Optionable's revenue from BMO would likely (and did, in fact) diminish dramatically.

-15-

38.   In addition, in each of the SEC Filings, KEVIN CASSIDY, the defendant, falsely asserted that he had disclosed to Optionable's auditors and the audit committee of Optionable's board of directors any fraud that involved management or other employees who had a significant role in Optionable's internal control over financial reporting, when, in fact, CASSIDY had not disclosed that he had been engaged with Lee in a scheme to defraud BMO.

39.   In addition, in the March 15, 2006 and March 23, 2007 SEC Filings, Optionable represented that it offered a service to its customers whereby Optionable assisted those customers in valuing their positions in the natural gas derivatives market. Optionable stated that it expected demand for this service to increase, creating new revenue opportunities.  However, Optionable did not disclose that, as KEVIN CASSIDY, the defendant, knew, Optionable was performing this service for BMO dishonestly and fraudulently in furtherance of CASSIDY and Lee's scheme to subvert BMO's independent price verification system.

<u>Statutory Allegation</u>

40.   From at least on or about November 7, 2005 through and including at least on or about March 23, 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the

-16-

defendant, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of Optionable securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon a person.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

### COUNT FOUR

(Securities Fraud - NYMEX)

The Grand Jury further charges:

41.  The allegations set forth in paragraphs 1 through 29, and 35 through 39 are repeated and realleged as if set forth fully herein.

-17-

42.   At all relevant times, NYMEX Holdings, Inc. was the parent company of the New York Mercantile Exchange ("NYMEX"). NYMEX is a commodities futures exchange based in Manhattan.

43.   On or about January 22, 2007, KEVIN CASSIDY, the defendant, and others, entered into a binding term sheet with NYMEX in which NYMEX agreed in principle to buy an amount of common stock of Optionable that would give NYMEX a 19 percent ownership interest in Optionable.

44.   During the course of this sale to NYMEX, with the knowledge and consent of KEVIN CASSIDY, the defendant, Optionable provided NYMEX with access to its revenue figures. Consistent with the revenue figures in Optionable's publicly filed regulatory filings, these revenue figures included substantial commissions from BMO without disclosing that, as CASSIDY knew, CASSIDY was engaged with Lee in a scheme to defraud BMO, and if and when BMO discovered the existence of that scheme, Optionable's revenue from BMO would likely (and did, in fact) diminish dramatically.

45.   On or about January 15, 2007, NYMEX asked Optionable for "[a]ny other documents or information which, in your judgment, are significant with respect to any portion of the business of [Optionable] or which should be considered and

-18-

reviewed in making disclosures regarding the business and financial condition of [Optionable] to prospective investors." On behalf of Optionable, KEVIN CASSIDY, the defendant, did not disclose to NYMEX that, as CASSIDY knew, CASSIDY was engaged with Lee in a scheme to defraud BMO, and if and when BMO discovered the existence of that scheme, Optionable's revenue from BMO would likely (and did, in fact) diminish dramatically.

46.   In or about April 2007, KEVIN CASSIDY, the defendant, certified in a purchase agreement with NYMEX that Optionable's regulatory filings were materially accurate.   However, as described in paragraphs 35 through 39, CASSIDY knew that these filings included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

47.   On or about April 10, 2007, NYMEX paid KEVIN CASSIDY, the defendant, approximately $5.1 million for his beneficially owned Optionable stock.   CASSIDY remained Optionable's chief executive officer.

<u>Statutory Allegation</u>

48.   From in or about 2006 through and including in or about April 2007, in the Southern District of New York and

-19-

elsewhere, KEVIN CASSIDY, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of Optionable securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon a person.

> (Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## FORFEITURE ALLEGATION

49.  As the result of committing one or more of the offenses alleged in Counts One through Four herein, defendant KEVIN CASSIDY shall forfeit to the United States all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title

18, United States Code, Section 981(a)(1)(c) and Title 28,
United States Code, Section 2461.

<u>Substitute Asset Provision</u>

50.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981, Title 28, United States Code, Section 2461.)

_____
Foreperson

_____
PREET BHARARA
United States Attorney

-21-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### KEVIN CASSIDY,

Defendant.

### <u>INDICTMENT</u>

S3 08 Cr. 1101

(18 U.S.C. §§ 1349, 1343, and 2; 15
U.S.C. §§ 78j(b) and 78ff)

<u>Preet Bharara</u>
United States Attorney.

**A TRUE BILL**

Foreperson.

6-2-11
WO

Filed Indictment

Peck
U.S.M.J