```
USDC SDNY
DOCUMENT
ELE[    ]     LY FILED
D[      ]      AUG 1 5 2011
DATE FIL[      ]
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x
                               :

UNITED STATES OF AMERICA

                               :      **SUPERSEDING INFORMATION**

     - v. -

                               :      S4 08 Cr. 1101 (TPG)

KEVIN CASSIDY,

                 :

           Defendant.

                               :

-----------------------------------x

## COUNT ONE

(Conspiracy To Commit Wire Fraud)

The United States Attorney charges:

### RELEVANT PERSONS AND ENTITIES

1.    At all relevant times, Optionable Inc. ("Optionable") was a commodities brokerage firm with a focus on natural gas and other energy derivatives.  At all relevant times, Optionable's principal place of business was in Westchester County, New York. At various times relevant to this Information, Optionable common stock was publicly traded on the OTC Bulletin Board.

2.    At all relevant times (other than from in or about April 2004 through in or about October 2005), KEVIN CASSIDY, the defendant, was Optionable's chief executive officer.  From in or about April 2004, through in or about October 2005, CASSIDY's job title was "consultant" to Optionable but his role in running

Optionable's day-to-day operations did not change.  From in or about September 2005 through at least in or about April 2007, CASSIDY beneficially owned Optionable stock and received annual compensation from Optionable.

3.    At all relevant times, Bank of Montreal ("BMO") was a bank with its principal place of business in Toronto, Canada. BMO operated a wholly-owned subsidiary called BMO Capital Markets Corporation.  A division within BMO Capital Markets Corporation called the Commodities Derivatives Group (hereinafter "the Commodities Group") was based in Manhattan and engaged in the business of trading instruments that derived their value from the market price of various underlying commodities, including natural gas.

4.    At all relevant times, David Lee, a co-conspirator not named as a defendant herein, worked in the Commodities Group as BMO's lead natural gas options trader.  Lee's annual compensation included a base salary, a bonus based primarily on the profitability of the Commodities Group's trading activities, and long-term incentive compensation based primarily on Lee's individual productivity.  At all relevant times, most of Lee's compensation consisted of bonus payments.

<u>BMO'S INDEPENDENT PRICE VERIFICATION SYSTEM</u>

5.    At all relevant times, BMO required traders in the
Commodities Group to assign the fair market value to each open
financial position in the trader's portfolio, which was also
known as a "book."  This process was known as "marking the
book," and the value assigned to each position was a "mark."
BMO used these marks, among other things, to value the trading
positions of the Commodities Group, to determine the profit
and/or loss for the Commodities Group, and to assess BMO's risk
exposure from the Commodities Group's trading positions.

6.    Through a process called "independent price
verification," BMO sought to verify the accuracy of the marks
that Commodities Group traders assigned to their positions by
comparing the traders' marks to independent market quotes for
similar positions.

7.    In or about 2001, Lee became BMO's lead natural gas
options trader.  In connection with BMO's independent price
verification process, Lee was required to mark the positions in
BMO's natural gas options book (hereinafter "Lee's Positions")
on a regular basis by assigning the fair market value to each
position.

8.   Because many of Lee's Positions were not widely traded on a public exchange, BMO could not readily ascertain pricing information for comparable positions based on public data. Accordingly, as part of its independent price verification of Lee's marks, BMO obtained price quotes from third-party brokerage firms for positions similar to Lee's Positions ("Verification Quotes") and compared Lee's marks to those Verification Quotes.

9.   At all relevant times, BMO's price verification personnel obtained Verification Quotes for Lee's Positions from Optionable.

### LEE MISMARKS HIS BOOK

10.   In or about May 2003, Lee began mismarking some of Lee's Positions by overstating their fair market value.   Lee continued mismarking some of Lee's Positions through at least in or about 2006, so as to lead BMO to believe that Lee's Positions were more profitable than they were; in fact, many of Lee's Positions were not profitable.   As a result of having been misled, BMO gave Lee greater trading authority, which enabled Lee to increase substantially the number of positions in BMO's natural gas options book.

11.   Lee mismarked Lee's Positions in an effort to enhance his apparent job performance and his bonus compensation.  Lee's compensation increased from approximately $722,000 in or about 2003 to approximately $5.35 million in or about 2006.

12.   In or about 2006, changes in the natural gas market caused a decline in the value of Lee's Positions.  Lee continued his mismarking during this time and made his natural gas book appear materially more valuable than it was.

THE SCHEME TO DEFRAUD

Cassidy Helps Lee Subvert BMO's
Independent Price Verification System

13.   Beginning at least in or about December 2004, KEVIN CASSIDY, the defendant, engaged in a scheme with Lee to subvert BMO's independent price verification system and, thereby, deny BMO its right to exercise supervision and control over its own assets.  To carry out this scheme, CASSIDY and Lee agreed that Lee would supply price quotes for Lee's Positions to Optionable and that Optionable brokers then would return – or regurgitate – Lee's self-serving quotes to BMO's price verification personnel as Verification Quotes for Lee's Positions, knowing that the quotes had actually originated with Lee, himself.  At all times, as CASSIDY knew, BMO was using this pricing information from Optionable to evaluate the accuracy of Lee's marks while under

-5-

the impression that the Verification Quotes were independent of Lee.

14.   KEVIN CASSIDY, the defendant, helped Lee evade BMO's legitimate oversight in the foregoing manner because, among other things, Lee had the power to select Optionable to execute Lee's commission-generating trades.   As CASSIDY knew, BMO paid lucrative commissions to the brokerage firms that Lee chose to execute his trades.

15.   KEVIN CASSIDY, the defendant, stood to profit, and in fact profited, from trading business that Lee sent to Optionable.   Among other things, CASSIDY's compensation at Optionable was based on Optionable's overall profitability.   In addition, Optionable's revenue and profitability impacted the value of CASSIDY'S ownership interest in Optionable.

### The Use Of "Round Trips"

16.   As part of this scheme, beginning at least in or about December 2004, KEVIN CASSIDY, the defendant, and Lee agreed that Lee would send pricing information to Optionable brokers twice each month and that Optionable brokers then would return that information – virtually unchanged – on a "round trip" or "u-turn" to BMO's price verification personnel, without disclosing to BMO that this information originated with Lee himself.

-6-

Consistent with this agreement between CASSIDY and Lee, Optionable personnel routinely received pricing information from Lee and regurgitated it in reports sent by interstate and international email to BMO's independent price verification and market risk personnel without disclosing that Lee was the information's source.

17.   Similarly, at various times relevant to this Information, Lee provided pricing information for Lee's Positions to KEVIN CASSIDY, the defendant, by telephone and instant message, and CASSIDY then returned the information - virtually unchanged - to Lee by instant message, knowing that Lee would submit the information to BMO's market risk personnel.

### The Use Of "RealMarks"

18.   In or about September 2006, BMO's independent price verification and market risk personnel discussed whether to begin verifying Lee's marks by comparing them to pricing information from a so-called multi-contributor pricing service (the "Multi-Contributor Service"), instead of by comparing them to Verification Quotes from Optionable.  The Multi-Contributor Service reported pricing information that it collected and aggregated from multiple independent natural gas traders.

19.   In order to forestall BMO's reliance on a Multi-Contributor Service to verify Lee's marks, KEVIN CASSIDY, the defendant - after consulting with Lee - induced BMO to subscribe instead to a new pricing service introduced by Optionable, called (among other things) "RealMarks."  RealMarks appeared as a grid with specific types of options in one column and corresponding market quotes in other columns.  Optionable publicly described RealMarks as providing "up-to-date, reliable information as to the real-time market valuations of options" and as "an invaluable tool for clients in monitoring their natural gas and energy derivative portfolios."

20.   From in or about September 2006 through and including in or about March 2007, at the end of the month, Lee filled out RealMarks grids with pricing information for some of Lee's Positions.  Using his personal email account from his home in New Jersey, Lee sent these completed grids to KEVIN CASSIDY, the defendant, in Westchester County, New York.  CASSIDY instructed an Optionable employee to return these grids to BMO with Lee's own pricing information without disclosing that, as CASSIDY knew, the pricing information reflected on the RealMarks grids originated with Lee himself.

-8-

21.   From in or about September 2006 through in or about March 2007, after receiving the RealMarks grids from Lee containing pricing information for Lee's Positions that originated from Lee himself, KEVIN CASSIDY, the defendant, instructed Optionable personnel to disseminate this pricing information by instant message to various traders in the natural gas sector.   CASSIDY instructed these Optionable personnel to return copies of these instant messages to him.   CASSIDY submitted these instant messages to BMO as "backup" to support the purported accuracy and independence of the pricing information that Optionable provided to BMO in the RealMarks grids without disclosing that, as CASSIDY knew, the pricing information reflected on the RealMarks grids originated with Lee himself.

## Optionable's Business From BMO Increases

22.   During the period when KEVIN CASSIDY, the defendant, was helping Lee subvert BMO's independent price verification system and, thereby, deny BMO its right to exercise supervision and control over its own assets, Optionable received an increasing amount of commission-generating trading business from BMO, and these commissions constituted a growing percentage of Optionable's revenues.   In its annual filing with the United

States Securities and Exchange Commission ("SEC") for 2005, Optionable reported that commissions from BMO accounted for 18 percent of its annual revenues.  In its annual filing with the SEC for 2006, Optionable reported that commissions from BMO accounted for 24 percent of its annual revenues.  In the first quarter of 2007, according to information that Optionable provided to its auditor as part of a quarterly review, commissions from BMO accounted for approximately 44 percent of Optionable's annual brokerage revenues - or approximately $2.3 million, which was more than Optionable generated from any other revenue source.

23.  In practical terms, the percentage of Optionable's revenue attributable to executing trades for BMO was significantly higher than the percentages that Optionable reported in its filings with the SEC.  When Optionable executed trades on behalf of BMO, in addition to receiving commissions from BMO, Optionable also received commissions from the counterparties to those trades.

## The Scheme Unravels

24.  In or about October 2006, BMO's independent price verification and market risk personnel started comparing the pricing information contained in Optionable's RealMarks grids

with information from the Multi-Contributor Service.  The
information from the Multi-Contributor Service indicated that
Lee's Positions were overvalued by tens of millions of dollars.

25.  In or about February 2007, BMO hired an outside
consultant to assess BMO's independent price verification
process.  In the meantime, the difference in the value of Lee's
Positions based on pricing data from the Multi-Contributor
Service and from Optionable's RealMarks service continued to
grow by millions of dollars.  Around the same time, BMO began to
liquidate some of Lee's Positions at a loss.

26.  On or about April 27, 2007, before the stock market
opened in the United States, BMO publicly announced for the
first time that it had sustained millions of dollars in
commodities trading losses, which included losses attributable
to remarking and liquidating Lee's Positions.  On April 27,
2007, Optionable stock opened at $7.20 per share and closed at
$5.56 per share.  On or about May 8, 2007, BMO publicly
announced that it had suspended its business relationship with
Optionable.  On or about May 9, 2007, Optionable publicly
reported that its loss of BMO's business would have an adverse
impact on Optionable's "business, including its future results

-11-

of operations and financial condition." On May 10, 2007, Optionable stock closed at $0.85 per share.

27. In or about mid-May 2007, Lee's employment at BMO ended.

28. On or about May 17, 2007, BMO publicly announced that it had experienced commodities trading losses of approximately C$680 million. In its Annual Report for 2007, BMO reported that it had experienced commodities trading losses of approximately C$853 million, which included losses resulting from remarking and liquidating Lee's Positions.

29. In an SEC filing for the third quarter of 2007, Optionable reported approximately $64,000 in commission revenue. In an SEC filing for the first quarter of 2008, Optionable reported no revenue.

## Statutory Allegation

30. From at least in or about December 2004 through and including in or about March 2007, in the Southern District of New York and elsewhere, KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit,

-12-

wire fraud, in violation of Title 18, United States Code, Section 1343.

31.   It was a part and an object of the conspiracy that KEVIN CASSIDY, the defendant, David Lee, a co-conspirator not named as a defendant herein, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, pictures, signals, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>Overt Acts</u>

32.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about December 29, 2004, at approximately 2:41 p.m., Lee sent an instant message to CASSIDY that contained pricing information relating to Lee's Positions.

-13-

b.   On or about December 29, 2004, at approximately 3:32 p.m., Lee sent an instant message to an Optionable employee that contained pricing information relating to Lee's Positions.

c.   On or about December 29, 2004, at approximately 3:39 p.m., CASSIDY directed an Optionable employee to send an interstate email to BMO's price verification and market risk personnel containing pricing information relating to Lee's Positions.

d.   On or about June 29, 2006, at approximately 11:03 a.m., CASSIDY spoke with Lee by telephone about sending pricing information to BMO's price verification and market risk personnel.

e.   On or about October 31, 2006, CASSIDY had a telephone conversation with Lee about wanting to speak with Lee on an unrecorded phone line.

f.   On or about January 30, 2007, Lee sent a blank RealMarks grid from his BMO email account while in Manhattan to his personal email account that he accessed in New Jersey.

g.   On or about February 28, 2007, CASSIDY had a telephone conversation with Lee about wanting to speak on an unrecorded phone line.

h.   On or about March 30, 2007, CASSIDY had a

-14-

telephone conversation with Lee about wanting to speak on an unrecorded phone line.

i.    On or about March 30, 2007, at approximately 5:17 p.m., CASSIDY had a telephone conversation with Lee about having sent pricing information to BMO's price verification and market risk personnel.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

33.    As the result of committing the offense alleged in Count One of this Information, defendant KEVIN CASSIDY shall forfeit to the United States all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

## Substitute Asset Provision

34.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

-15-

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981, Title 28, United States Code, Section 2461.)

PREET BHARARA
United States Attorney

-16-

0

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

KEVIN CASSIDY,

Defendant.

## INFORMATION

S4 08 Cr. 1101 (TPG)

(18 U.S.C. § 371)

Preet Bharara
United States Attorney.