UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                               :
UNITED STATES OF AMERICA      :
                                               :
          - v. -                            :     S4 08 Cr. 1101 (TPG)
                                               :
KEVIN CASSIDY,                    :
                                               :
          Defendant.              :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## GOVERNMENT'S SENTENCING SUBMISSION


 

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States of America

MICHAEL A. LEVY
JILLIAN B. BERMAN
Assistant United States Attorneys,
    Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :

UNITED STATES OF AMERICA      :

              - v. -                    :        S4 08 Cr. 1101 (TPG)

KEVIN CASSIDY,                  :

            Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GOVERNMENT'S SENTENCING SUBMISSION

The Government respectfully submits this memorandum in connection with the upcoming sentencing of defendant Kevin Cassidy. For the reasons that follow, the Government respectfully submits that the Court should adopt the recommendation of the United States Probation Office (the "Probation Office") and impose a sentence of imprisonment within the applicable Sentencing Guidelines range of 30 to 37 months.

**Argument**

1. <u>Cassidy's Criminal Conduct Warrants A Guidelines Sentence</u>

As set forth in the Probation Office's Presentence Investigation Report ("Presentence Report" or "PSR"), Cassidy engaged in a scheme to defraud the Bank of Montreal ("BMO") by agreeing to provide BMO with independent verification of the accuracy of values that BMO natural gas options trader David Lee assigned to positions that Lee had taken on BMO's behalf in the market, but then secretly colluding with Lee simply to supply BMO with Lee's own self-serving valuations. (PSR ¶ 21). In doing so, Cassidy and Lee conspired to remove a critical component of BMO's oversight of Lee's trading activities. This proved to have disastrous consequences for BMO, which ultimately discovered that Lee had been deliberately mismarking

the positions he took on BMO's behalf. (PSR ¶¶ 18-19).  That, in turn, had disastrous consequences for the investors in Optionable – Cassidy's brokerage firm – which lost its business from BMO and collapsed.  (PSR ¶ 35).

In his sentencing submission, Cassidy attempts to downplay the significance of his conduct.  Cassidy repeatedly asserts that he "did not know that Lee was mismarking his book" (Def. Mem. at 2), and, for that reason, that the sentence suggested by the Sentencing Guidelines is too harsh.

Cassidy's argument fails for two reasons.  First, whether or not Cassidy is correct in his assertion that he was unaware that Lee was deliberately mismarking his book, the nature of Lee and Cassidy's scheme leaves little doubt that Cassidy at least surmised that he could be helping Lee conceal deliberate mismarking.  BMO requested that Cassidy provide independent quotes, observed in the marketplace, for the various positions that Lee was taking in the market with BMO's money.  Cassidy explicitly agreed to do so, and he has made clear that he understood both that BMO was using these quotes to double-check Lee's own valuations, and that, for this reason, BMO wanted these quotes to be obtained from a source independent of Lee.  But instead of providing independent quotes, Cassidy simply solicited Lee's own valuations from Lee.

In these circumstances, it is a transparent fiction for Cassidy to argue that he thought Lee's quotes were accurate and that, as a result, he did not know that he "was participating in a scheme to deceive [BMO's] market risk department as to the value of Lee's book."  (Def. Mem. at 16.)  It would have been no harder for Cassidy to provide the independent quotes that he promised to BMO than to provide the fraudulent quotes derived from Lee.  If Cassidy truly believed the scheme had no benefit to Lee and no consequence for BMO, Cassidy would have

simply provided independent quotes; *i.e.*, Cassidy would not have chosen to engage in a fraud that served no purpose.

In fact, Cassidy knew full well that he was deliberately subverting BMO's oversight of Lee's trading. Although impossible to know for sure, it is a fair inference that Cassidy suspected that Lee was deliberately mismarking his book and that Cassidy was helping to protect Lee from having that fact discovered by BMO's market risk department. If an employee at a bank suddenly appears and asks the night watchman to go away for an hour – *i.e.*, to abandon, as Cassidy did, his position in the bank's security system – the night watchman's subsequent claim that he suspected no wrongdoing would be a dubious one.

Even apart from the prospect of deliberate mismarking by Lee, however, Cassidy undoubtedly knew that Lee's own marks – which Cassidy took without question – were subject to being incorrect, either due to error or Lee's unwarranted, self-serving optimism. (Even if Lee had not been deliberately mismarking his book, he nonetheless had an incentive to resolve ambiguous valuations in his favor.) Likewise, by regurgitating Lee's own marks to BMO, Cassidy knew that he was protecting Lee from having his marks scrutinized and challenged by BMO's market risk department. Cassidy's assertion that the scheme was intended to spare Lee from interference by a "risk management department [that] was meddlesome and misguided" (Def. Mem. at 16 n.3) concedes as much. At a minimum, Cassidy knew that providing the independent marks that BMO actually wanted could produce troubling discrepancies between those marks and Lee's own valuations; this, in turn, could subject Lee's valuations to inquiry and revisions by BMO's market risk department. Providing Lee's own marks to BMO's market risk

department, by contrast, would ensure that any errors in Lee's valuations – whatever their cause – would go unnoticed and Lee, himself, would go unchallenged.[1]

Second, even if Cassidy were right that he had no reason to anticipate the harm that Lee was inflicting on BMO – and, for the reasons just stated, he is not – he is not being held responsible for that harm in any event. As stipulated by the parties, the harm that Lee inflicted on BMO through his mismarking is sufficiently difficult to calculate that Cassidy's offense level under the Guidelines has been calculated using Cassidy's gain – specifically the commissions that Cassidy brought in from BMO during a period when BMO, had it know about the scheme, would certainly have fired Cassidy and Optionable as its broker. Thus, because the harm that Lee inflicted on BMO is not a component of Cassidy's Guidelines calculation of 30 to 37 months, Cassidy's claim that he did not anticipate that harm has no bearing on whether a sentence within that Guidelines range is appropriate.[2]

---

[1] Cassidy argues that after receiving marks from Lee, he showed Lee's marks to the market and, as a result of this process, he believed that Lee's marks were, in fact, validated as accurate. Although Cassidy did not invariably engage in this process, and there were numerous ways in which Cassidy and Lee rigged the process when Cassidy did do so, the issue need not be debated here. It is sufficient to point out, again, that it would have been just as easy for Cassidy to show independent marks to the market, rather than marks supplied by Lee. Choosing to use Lee's marks had a purpose, and that purpose – as Cassidy well knew – was to make sure that the "independent" quotes that Cassidy was purporting to provide would, in fact, match Lee's own valuations, thus sparing Lee from having BMO's market risk department challenge the valuation of Lee's positions.

[2] At several points in his submission, Cassidy claims that the conduct in which he engaged and the harm for which he is being held responsible – fraudulently denying BMO the right to control and supervise its own trader and assets – is the "type of conduct more typically addressed in the context of civil or regulatory proceedings." (Def. Mem. at 2). Cassidy offers no support for this assertion, and it is not true. Individuals and entities have a right to make their own decisions about how to control their assets, and individuals are frequently prosecuted for employing fraudulent means to interfere with that control, even where the wrongdoer believes his judgment is superior and that the asset's owner will not suffer a financial loss. Cassidy's conduct here –

-4-

2. <u>The Court Should Reject Cassidy's Request For A Non-Custodial Sentence Based On The Central Role Cassidy Holds Within His Family And At Steelways</u>

Cassidy also urges this Court to impose a below-Guidelines, non-custodial sentence of community confinement or home detention based on his arguments that he is indispensable to his family, his AA community, and his current employer, Steelways, a steel fabrication company. (Def. Mem. at 26-31). The Court should reject these arguments. While the Government does not dispute that Cassidy may be a devoted family man and an important member of Steelways, it is simply not the case that his family or his business will stall in his absence.

With respect to his family, Cassidy argues, among other things, that he "plays a critical role in his mother's life," in that he is "the only male in the family that is local and able to be there for" her. (Def. Mem. at 18, 30 & Exh. 6 (quoting Nancy Cassidy) (internal quotation marks omitted)). Cassidy's mother writes that the defendant "is really the man in the family," (*id.*), and he makes decisions concerning his mother's medical care, drives her to and from medical appointments and church, and does things for her around her house. (*Id.* at 19, 30 & Exh. 6). Yet Cassidy has three sisters who live in Westchester County, New York near his mother, and a fourth who lives nearby in Southern Connecticut. According to the PSR, three of these four sisters are not employed and are financially supported by their spouses. (PSR ¶ 75).

---

taking it upon himself, through fraud, to determine that BMO's chosen mechanism for supervising Lee's trading was misguided and worthy of being subverted – is no different from other "right to control" cases prosecuted in this circuit. *See*, *e.g.*, *United States* v. *Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) (prosecution of loan broker who intended victims' loans to close, but fraudulently misled victims about the likelihood that loans would close in order to prevent them from exercising discretion about whether to abandon their projects); *United States* v. *Dinome*, 86 F.3d 277, 283-85 (2d Cir. 1996) (prosecution of home loan applicant for fraudulently subverting bank's loan standards and preventing bank from exercising discretion about whether to make loan, even though applicant intended to repay the loan).

-5-

Thus, while the Government does not minimize the strain and burden associated with caring for an elderly, ailing relative, it is evident that Cassidy comes from a large, supportive family that can carry on in his absence. Indeed, in addition to Cassidy's wife, grown daughter, four sisters, and three brothers-in-law, who live near his mother and collectively, should be in a position to assist her day-to-day affairs, Cassidy has two brothers who reside in Florida and can contribute to important family decisions. (*Id.*). Cassidy's self-described "large extended family," consisting of nieces and nephews (Def. Mem. at 10), should also be able to assist if called upon. There is simply no reason that Cassidy should receive a lesser sentence on the ground that he – like many individuals who commit crimes and are sentenced to prison – has a family that would prefer that he not be sentenced to incarceration.

Similarly, with respect to the support that Cassidy has extended to members of his AA community and others with substance abuse issues, such conduct is admirable but it does not militate in favor of a lesser sentence. Cassidy can continue to provide emotional support to individuals through letters and emails while he is incarcerated. He can also use his time in prison to develop plans in furtherance of his purported goal of establishing a substance abuse treatment center.

Finally, Cassidy argues that he is "absolutely essential" to Steelways and, as a result of the critical role he plays there, he should not be sentenced to a term of imprisonment. (Def. Mem. at 27-29). Cassidy presents letters to this Court submitted by individuals at Steelways attempting to bolster this point, including a letter from Steelways founder David Plotkin stating that Plotkin "will almost certainly have to consider terminating" the company if Cassidy goes to jail. (*Id.* at 27 & Exh. l). While Cassidy's sentencing submission presents a compelling case that

Cassidy has played an instrumental role in growing Steelways from a five-employee company to a 35-employee company – and this is admirable conduct – Cassidy and his colleagues are hard-pressed to explain why Steelways must necessarily fail if Cassidy goes to prison.  Given Cassidy's representation that Steelways has become a thriving business under Cassidy's watch, there is no reason why Steelways would not be in a position to attract a suitable candidate to replace Cassidy at the helm of the company.  It does not appear that Cassidy had any experience in the steel fabrication business prior to joining Steelways, and undoubtedly there are other qualified individuals who could take over this position.  Moreover, the company has had more than ample opportunity to look for a qualified individual to fill Cassidy's role.  Indeed, Cassidy was under indictment in connection with the instant case virtually his entire time at Steelways, and since that time, Cassidy's future at the company has necessarily been clouded by the possibility that he will have to serve a term of imprisonment.  Moreover, Cassidy pleaded guilty to the offense of conviction more than ten months ago, at which time he agreed that he faced a Guidelines sentence of 30 to 37 months and that such a sentence would be reasonable.  Since ten months ago at the very least, Cassidy knew that his future likely held another term of imprisonment.  As such, there is no reasonable basis for Cassidy or his colleagues at Steelways to argue that they have had insufficient time to find a worthy replacement for Cassidy at Steelways or that they have no option without Cassidy other than to close the business.

**Conclusion**

For the reasons set forth above, the Government respectfully submits that the Court should sentence Cassidy to a term of imprisonment within the stipulated Guidelines range of 30 to 37 months' imprisonment.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   /s/    Jillian Berman
MICHAEL A. LEVY
JILLIAN B. BERMAN
Assistant United States Attorneys
(212) 637-2346/1205